Whitaker j Judge,
delivered the opinion of the court:
Plaintiff sues to recover its costs and damage which resulted by reason of the termination, for the convenience of the Government, of two contracts, one an experimental and the other a production contract, for the manufacture of compulsion systems for the Terrier Missile. The Government defends on the ground, among others, that the plaintiff’s termination claim was fraudulent, and, therefore, that it is forfeited to the United States under section 2514 of Title 28 *336 U.S.C.[1] In addition, the Government counterclaims to recover double damages and a $2,000 penalty under the False Claims Act, 31 U.S.C. § 231. We consider this question first, since, if it is answered in the affirmative, it will be unnecessary to consider the other questions propounded.
From the record, it appears that during the period when the two contracts here involved were being performed the plaintiff’s president and majority stockholder, Mr. A. A. Wagner, and the vice president and owner of substantially all of the remaining stock, Mr. A. J. Werner, caused the corporation to pay certain of their personal expenses, which affected the termination claims. Mr. Wagner employed the Black-Top Specialty Company to construct a tennis court and paved driveway at his house in the country. He not only caused the plaintiff company to pay for this work, but prepared a false invoice, so that, upon an examination of the company books, it would appear that the work had been done for the company. Mr. Wagner also had the company pay for a number of other personal expenses. These included such items as the funeral expenses of his father-in-law, fuel oil and gas delivered to his home, etc.
Werner also caused the company to pay for services and material for his own personal benefit. In one instance, he had a plumbing company perform some work on his mother’s home, which was paid for by the plaintiff company. He, too, had the plaintiff provide and pay for fuel oil and gas at his home for his personal use. Also, on another occasion the company paid for a heating plant to provide heat for his swimming pool.
The total of the personal expenses of Wagner and Werner paid for out of corporate funds aggregates between seventy-five and one hundred thousand dollars, the majority of which were for Wagner’s personal expenses.
All of the above expenses were charged to various company operating accounts, and were included in the company’s *337 total indirect operating and administrative expenses. These expenses were allocated in part to the Government contracts, and in part to other contracts, and were reflected in the termination claims. Plaintiff prepared statements using seven percent of its total indirect expenses as the amount allocable to the Navy contracts. Thus, $5,535.53, or seven percent of $79,009.72, of personal expenditures were included in these cost schedules filed in support of the termination claims. These were submitted to the Navy Department in April 1954 for payment, and when that was denied, they were filed in this court on June 29, 1954, pursuant to Rule 28(b) (2), as the basis for plaintiff’s claim against the United States.
Shortly after they had been filed in this court, the plaintiff was notified that the Federal Bureau of Investigation would audit plaintiff’s books pursuant to Rule 28 (b) (3) of this court. On learning of this, Wagner, in early October 1954, presented a list of invoices to Werner, and confessed that they had been paid for by the company, although they were for his own personal use. In consequence, at a meeting of the Board of Directors on November 22,1954 Wagner was forced to resign as president, and Werner was elected to that position. Immediately thereafter, Werner repaid the company some or all of the amounts paid for his personal expenses, and he informed the Federal Bureau of Investigation that the schedules filed were incorrect and that revised cost schedules would be filed, and they have since been filed in this court, from which all ascertainable personal items have been deleted.
That Wagner defrauded the corporation, of which he was president is admitted; but that, of course, is not the issue here. The fraud committed against the United States consists of the presentation to the Navy and to this court of statements claiming that plaintiff had - spent sums in the performance of the contracts which in fact had not been so expended, but, on the contrary, had been expended for the personal benefit of its officers. The issue is whether these fraudulent acts are to be imputed to the plaintiff company.
It has been often stated that a corporation can act only through its officers and agents, and when they are clothed with the authority to act for it, the corporation is responsible *338 for their acts. Gleason v. Seaboard Air Line Ry., 278 U.S. 349; Standard Surety & Cas. Co. v. Plantsville Nat. Bank, 158 F. 2d 422; Ralston Purina Co. v. Novak, 111 F. 2d 631. Wagner, the president, was authorized to prepare and present for payment vouchers showing the plaintiff’s costs in the performance of the government contracts. When he presented statements which he knew contained costs which were not spent in their performance, he undertook on behalf of the corporation to secure from the United States funds to which he knew the corporation was not entitled. The corporation stood to benefit from the fraud he attempted to practice on its behalf, and having clothed him with authority to present vouchers for payment, the corporation is responsible for his actions.
Plaintiff, however, says that since the fraud against the United States was the outgrowth of the fraud against the company by its president, his acts should not be imputed to it. It says that when the other stockholder, holding almost 50 percent of the stock, learned of Wagner’s defalcation, he caused Wagner to surrender his office of president, and then caused the plaintiff to immediately repudiate Wagner’s acts and to promise to file corrected statements as soon as the true facts could be ascertained, which was done after the investigation was completed.
If Wagner alone had been guilty of fraud, there might be some merit in plaintiff’s argument. However, Werner, the vice president and the holder of nearly 50 percent of the stock, also made use of corporate funds for his personal expenditures, although not to the extent that Wagner did.
It was not until the extent of Wagner’s defalcations had been indicated, and the Federal Bureau of Investigation had come into the matter, that Werner reimbursed the corporation for the sums it had expended some two years or so earlier for Werner’s personal benefit. It was only under the stress of such circumstances that Werner notified the Federal Bureau of Investigation that the cost schedules were false.
Wagner owned approximately 53 percent, and Werner, 46.5 percent of the outstanding stock of plaintiff corporation. They were president and vice president, respectively, and controlled the Board of Directors. They were, in fact, the *339 corporation and, therefore, their fraud is the corporation’s fraud.
Judgment of forfeiture of plaintiff’s claim against the United States will be entered, and plaintiff’s petition is dismissed.
The defendant also counterclaims pursuant to section 231 of Title 31 U.S.C. Section 231 provides that every person knowingly making a false claim against the United States shall forfeit $2,000 and pay double the damages sustained. In the instant case, the presentation of the cost schedules to the Navy Department for payment constituted a false claim against the United States. Since the defendant has neither alleged nor proven damages, its recovery under its counterclaim is limited to $2,000. Defendant is given judgment against the plaintiff on its counterclaim in the sum of $2,000.
It is so ordered.
Albert Y. Bryan, District Judge, sitting by designation; Laramore, Judge; Madden, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Wagner Iron Works, is a corporation organized and existing under the laws of the State of Wisconsin with its principal office and place of business at 1905 South First Street, Milwaukee, Wisconsin.
Its principal officers were A. A. Wagner, President, and A. J. Werner, Executive Vice President, who held substantially all of the capital stock of approximately 53 percent and 46.5 percent respectively.
2. In its original petition filed February 12, 1953, the plaintiff claimed losses and damages of $847,834.93, plus a loss of anticipated profit of $225,274.50, upon alleged breach of its contract NOrd-11861, hereinafter described.
By its amended petition filed November 7, 1955, claim is made for $1,105,988.39 for losses and damages, expenses and loss of profit upon alleged breach of contract NOrd-11861, and Amendment No. 1 thereto, hereinafter described. In *340 the alternate and as a second cause of action, claim is made for the sum of $797,739.69 by reason of the cancellation of the said contract No. 11861 under the clause entitled “Termination for Convenience of the Government”.
By its second amended petition filed February 29, 1956, the plaintiff claims costs and settlement expense by reason of the termination of its cost-plus-fixed-fee contract NOrd-11447 in the sum of $52,939.98 and additional legal fees previously disallowed of $3,115.42, plus any settlement expense that may be properly transferable from contract NOrd-11861, in addition to payments previously received under No. 11447. In addition, claim is made for the sum of $1,252,-264.11 by reason of the termination and cancellation of contract No. 11861, less any sum that may be found properly allocable- for recovery under contract No. 11447, and less all credits to which the defendant is entitled.
In the alternate, and as a second cause of action in its second amended petition, the plaintiff claims the sums under both contracts as set forth above, plus $212,808.69 for the loss of anticipated profit for the alleged breach of contract NOrd-11861.
3. Pursuant to the provisions of Section 2 (c) (1) of the Armed Services Procurement Act of 1947, Public Law 413, 80th Congress, 62 Stat. 21, cost-plus-a-fixed-fee contract NOrd-11447, dated March 8, 1951, was entered into between the plaintiff and the defendant, through the Bureau of Ordnance, Department of the Navy, by Captain G. W. Wales, contracting officer, which called for “Engineering and experimental production of metal parts for booster and sus-tainer cases” at an estimated cost of $271,062.50, with a fixed fee allowance of $13,000, and the estimated completion date of October 1, 1951. The scope of the contract, as set out in schedule A therein, reads as follows:
Engineer for production the metal parts for the Type 2.5-DS-59000 TERRIER Missile Booster Case and the Type 20-DS-2350 Sustainer Case; and .perform experimental fabrication of twenty-five (25) sets each of the metal parts for the Booster and Sustainer Cases.
By amendment No. 1 dated December 26,1951 the estimated cost, including the fixed fee of $13,000, was increased from *341 $284,062.50 to $380,662.50 and by amendment No. 2 dated February 19, 1952 the estimated amount was increased to $519,013.92, including the fixed fee of $13,000.
Contract NOrd-11447, referred to hereinafter by number only, contained no specifications for the materials required in the missile parts nor were any drawings designated therein for the production of the parts called for. However, in its undated request for proposals issued about January 30,1951, the Bureau of Ordnance cited two drawings by the M. W. Kellogg Company, of Jersey City, New Jersey, as references (a) and (b), and stated in part:
2. References (a) and (b), copies of which have been previously furnished by the Bureau of Ordnance, show proposed layouts of the TERRIER booster and sustainer metal parts which are currently under consideration for experimental production and education courses to facilitate later production. These units will be provided with a suitable propellant charge with an igniter assembly and will be used as propulsion units for guided missiles. These units will remain basically as shown in references (a) and (b) but substantial changes in details and methods of manufacture may be made.
$ $ $ $ $
9. It is considered appropriate to point out that the Bureau of Ordnance will have considerable requirements for various booster and sustainer units. Initially these requirements may total about 150 units per month and within a period of one (1) or two (2) years these requirements may grow to several thousand per month. It is anticipated that this work will be spread out to several Bureau of Ordnance contractors’ facilities. Additional units may be procured by suitable amendment to the proposed contract or by subsequent contracts as circumstances may dictate at the completion of the proposed educational program.
The plaintiff submitted its bid estimate on February 14, 1951, which included items for special tools and fixtures at the estimated cost of $51,500. Contract NOrd-11447 was awarded plaintiff on the basis of its bid estimate, excepting an item of $15,000 for contingencies.
4. Contract 11447 provided in part:

Articles. Compensation:

(a) The Government shall pay to the Contractor as full compensation for the performance of this contract:
*342 (1) The fixed fee, if any, specified in Schedule A; and
(2) Costs, not expressly excluded by any other provision of this contract, incurred by the Contractor in the performance of this contract which shall be claimed by the Contractor and accepted as such cost by the Bureau of Supplies and Accounts (Cost Inspection Service) in accordance with the provisions of Part 2 of Section XV of the Armed Services Procurement Regulation, * * *
$ Hs H* H* ❖
_ Article 11. Disputes. All disputes concerning questions of fact as to Allowable Costs arising under this contract shall be decided by the Chief of the Bureau of Supplies and Accounts, and all disputes concerning questions as to the purpose and necessity of the work giving rise to the costs incurred under this contract shall be decided by the Chief of the Bureau of Ordnance subject to written appeal, in either case, by the Contractor within thirty (30) days to the Secretary of the Navy or his duly authorized representatives, whose decision shall be final and conclusive. In the meantime, the Contractor shall diligently proceed with performance.
❖

Article 83. TERMINATION BY THE GOVERNMENT.

(a) Notice of Termination of Contractor’s Right to Proceed. The performance of work under this contract may be terminated by the Government in whole, or from time to time in part, whenever for any reason the Contracting Officer shall determine any such termination is for the best interests of the Government. Termination of work hereunder shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract shall be terminated and the date upon which such termination shall become effective.
* $ * $ $
(c) The Contractor and the Contracting Officer may agree upon the whole or any part of the amount or amounts, including an amount with respect to the fixed fee payable under this contract, payable in connection with the Contractor’s claim under the contract in the event of the total or partial termination of work pursuant to this Article.
(d) In the event of the failure of the Contractor and Contracting Officer to agree as provided in paragraph (c) upon the whole amount to be paid to the Contractor in connection with the termination of work pursuant to *343 this Article, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (c), shall pay to the Contractor the following amounts:
(1) All costs and expenses reimbursable in accordance with this contract, not previously paid to the Contractor for the performance of this contract prior to the effective date of the Notice of Termination and such of these costs as may continue for a reasonable time thereafter with the approval of or as directed by the Contracting Officer (which approval shall not be unreasonably withheld), provided, however, that the Contractor shall proceed as rapidly as practicable to discontinue such costs.
(2) The cost (so far as not included in payments under subparagraph 1 above) of settling and paying claims either arising out of the termination of work under subcontracts or orders or with respect to any other obligations, commitments and liabilities the cost of which would be reimbursable in accordance with the provisions of this contract or arising in connection with the termination of this contract in whole or in part and properly chargeable to this contract, * * *.
(3) Any other reasonable cost, approved or ratified by the Contracting Officer (which approval or ratification shall not be unreasonably withheld), incidental to the termination of work under this contract, including legal, accounting, clerical and other costs and expenses (taking into account a reasonable allocation of executive, administrative, and office expenses of the Contractor properly allocable to the termination of such work) * * *.
By amendment 3, dated May 17, 1952, confirming telegraphic termination of May 1,1951, contract 11447 was terminated for the convenience of the Government in accordance with the terms of Article 23.
5. The purpose of the Terrier missile booster was to start the missile off and the susfcainer was intended to accelerate and sustain compulsion. Together they constituted the compulsion system for the missile.
The Allegany Ballistics Laboratory was responsible for the development of the compulsion system for the Terrier missile, and the M. W. Kellogg Company was the lead research and development contractor. The M. W. Kellogg Company commenced the development work in 1947 and continued through 1953 or 1954.
By February 1951, the M. W. Kellogg Company had produced prototypes of the Terrier booster and sustainer, *344 and the first drawings furnished the plaintiff were those of the M. W. Kellogg Company. Prior to the award of contract 11447 the plaintiff’s representatives examined the Kellogg Company drawings at the Bureau of Ordnance and were cleared, along with other prospective contractors, to visit the Kellogg Company’s plant to ascertain the facilities required and observe the production processes employed. Such visits were made and the plaintiff’s representatives observed the production processes employed by the Kellogg Company.
6. In May 1951 Navy representatives visited the plaintiff’s plant, inspected its facilities, and recommended that plaintiff be awarded a production contract for the Terrier missile compulsion system, parts. About the same time the plaintiff was orally instructed to purchase sheet steel of the type required for 500 booster cases and 500 sustainer cases, in contemplation of a production contract.
On May 18, 1951 the plaintiff submitted its bid for the production of 300 or 500 sets of boosters and sustainers at a unit price of $7,509.15 per set. Plaintiff’s bid was predicated upon the use of tooling, dies, jigs, fixtures, and equipment being procured under contract 11447, and submitted a breakdown of its estimated cost, on which a profit of 10 percent was added. In the same letter the plaintiff advised the Bureau of Ordnance that orders for material had been placed for 500 boosters and sustainers in accordance with earlier instructions.
By telegram of June 1, 1951 the Navy instructed the plaintiff to purchase sheet steel of 41-30 type for 500 booster cases and a suitable substitute for NES 70 steel for 500 sus-tainer cases under contract 11447. On June 19, 1951 the plaintiff wrote the Bureau of Ordnance that it had placed orders, not only for the sheet steel but all material required for 500 boosters and 500 sustainers, which included forging steel and other items, and requested confirmation, or advice whether such orders should be withdrawn. The purchases of all material were approved and confirmed by letter of July 18, 1951, for the 500 sets of boosters and sustainers, with instructions that plaintiff adjust the purchase orders for 300 sets to reflect appropriate charges against contract *345 NOrd-11861 which had been awarded in June 1951, and that contract 11441 would be adjusted, if possible, to provide for the materials only for the additional 200 boosters and sustainers. The materials for the 200 additional units were ultimately included as item 2 to contract 11861, as reported in the following finding.
7. Pursuant to a letter of intent of the same date, contract NOrd-11861, dated June 26, 1951, was executed by the plaintiff and the defendant, through the Bureau of Ordnance, Department of the Navy, by Captain G. H. Wales as Contracting Officer. Contract NOrd-11861 was negotiated pursuant to the provisions of Section 2 (c) (1) of the Armed Services Procurement Act of 1947, Public Law 413, 80th Congress, 62 Stat. 21. It was a fixed price contract for $2,252,745. Item 1 called for the production and delivery of 300 sets of metal parts “(less arming devices)” for boosters and sustainers for Terrier missiles at $7,509.15 per set. The contract provided for deliveries at 30 sets per month commencing in November 1951, f. o. b. carrier at the plaintiff’s plant. The schedule of agreement contained the following provisions:
3. Government-furnished Property: Subject to all the terms, conditions and provisions of the un-numbered clause attached hereto entitled “Government-furnished Property” the Government will furnish to the Contractor those tools, dies, jigs, gauges and fixtures acquired by the Government under Contract NOrd-11447.
4. Specifications: With regard to the supplies called for by Item 1, the metal parts for Terrier Boosters Lot 4 (2.5-DS-59000, X216.A1) are to be manufactured strictly in accordance with Bureau of Ordnance L. D. No. 255956 dated 9 May 1951 and all BuOrd sketches and specifications listed thereon. The metal parts for Terrier Sustainers Lot 4 (20-DS-2350, X213-C1) are to be manufactured in accordance with Bureau of Ordnance drawings to be furnished at a later date.
5. Redetermination of Contract Prices: For the purposes of the unnumbered clause attached hereto entitled “Redetermination of Contract Prices” the Contractor shall submit a revised cost analysis upon the completion of delivery of 120 sets of Item 1. For the purposes of paragraph (b), the withholding percentage is established at 5%.
*346 The unnumbered clause referred to in paragraph 5 above provided in part:
Such redetermined prices shall apply to articles delivered or to be delivered, but the total of such redetermined prices shall in no event exceed the total contract price set forth in this contract less any part thereof applicable to any terminated portion of the work under this contract.
Article 2 provided for changes, article 3, extras, article 12 related to disputes and is similar to article 11 in contract NOrd-11447, and article 21 provided for termination for the convenience of the Government and contains substantially similar provisions as article 23 in contract 11447.
Paragraph (e) of article 21 provided that “In the event of the failure of the Contractor and the Contracting Officer to agree as provided in paragraph (d) upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this clause, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (d), shall pay to the Contractor” for completed supplies accepted by the Government and not therefore paid for, and the total costs incurred in the performance of the work terminated, plus a sum equal to 2 percent of materials not processed and 8 percent of other costs, the aggregate of which was not to exceed 6 percent of the costs incurred on terminated work.
Amendment No. 1, hr the form of a letter of intent dated November 21, 1951, provided for the payment of material for the 200 additional boosters and sustainers, the storage of such material for a period of not to exceed 180 days and the loading of the same on cars at or near the contractor’s plant, for the estimated sum of $275,000. The letter of intent provided for termination of the same unless a definite contract covering this matei'ial was executed within 60 days from the date thereof. By amendment No. 1 to the letter of intent, time for executing a contract amendment was extended to April 15, 1952. The letter of intent was thereafter terminated May 8, 1952 by telegraphic advice, which was confirmed by letter August 11,1952.
The basic contract 11861 was also terminated May 8,1952 *347 by telegraphic advice to the plaintiff, with confirmation by letter August 11,1952.
The commencement of production under contract 11881 was never authorized by the defendant. Final drawings and specifications for contract 11861 were never furnished the plaintiff upon which it could have proceeded.
8. The plaintiff’s business was originally organized as a single proprietorship in 1850. Prior to 1945 it was primarily engaged in ornamental metal manufacturing. But during World War II it engaged in war production, producing hatches for liberty ships, miscellaneous railings and steel stairs and oil barges. In the latter part of 1945 plaintiff acquired the property and shipbuilding business of Froemming Brothers, Inc., where it is presently located. This property consisted of approximately 10% acres with a plant and facilities located in one corner of the site, which was later designated as shop No. 1. Thereafter the plaintiff expanded its operations by the production of new items. The principal items of additional production consisted of a hydraulic front end loader and taping machines. The front end loader consisted generally of a boom with a bucket attached, which was operated by a hydraulic system of control valves, pistons and cylinders, a control stick, hydraulic lines for the flow of oil, and a pump. It was designed for attachment to a tractor or other material handling equipment. The taping machine was designed to automatically apply gummed tape to seal a carton package as it passed through a production line. The plaintiff was not equipped with the necessary machine tools, and most of the component parts for the front end loader and the taping machines were subcontracted.
No new products were established during the period of the contracts involved herein, but the production, of front end loaders increased progressively and constituted the majority of all commercial sales during the following years:

*348 9. The Wisconsin Design and Engineering Company of Milwaukee, specializing in the design and manufacturing of specialized machine shop equipment, produced component parts for plaintiff’s taping machines. As tractors came through with greater power it became necessary to generate greater power for the front end loaders and to provide heavier valves for the same. In 1950 the plaintiff negotiated with the Wisconsin Design and Engineering Company to design a heavier valve and to manufacture the valve and other component parts for plaintiff’s production. During the discussions the plaintiff proposed to construct a building on the northwest corner of its property, diagonally across from its main shop No. 1, that would be rented to the subcontractor for its work, which was agreeable to the Wisconsin Design and Engineering Company. The plan of the original building was approximately 100 feet square and construction was commenced in January 1951. It later became known as shop No. 2. The new building was adjacent to another street, having its own ingress and egress. A railroad spur line traversed the property in a circular fashion to effectively service both shops.
In the meantime the plaintiff, through its Washington representative, Robert S. Moss, commenced negotiations with the defendant in late 1950 to participate in the missile program. Upon the award of contract 11447 the plaintiff terminated its plans with Wisconsin Design and Engineering-Company and decided to use shop No. 2 for the performance of the contract, which would facilitate required security measures. The plaintiff also decided to extend the length of the building from 100 to 129 feet and to devote the south bay of approximately 20 feet in width to the manufacture of some of the parts for its commercial production. After the award of contract NOrd-11861 the plaintiff planned to use shop No. 2 exclusively for Navy production. The plaintiff was never authorized to commence production under 11861, and it continued the use of the south bay for its commercial work throughout the cost period herein.
A further extension of approximately 30 feet was constructed on the west end of shop No. 2 to provide for the installation of heating furnaces and other facilities required *349 for production under contract 11861. This addition cost the plaintiff approximately $35,000. The new building, including extensions and manufacturing facilities purchased by the plaintiff, was supported by a Certificate of Necessity for tax amortization by the Defense Production Administration, certifying that 70 percent of the cost was attributable to defense purposes. The south side of the extensions, commencing from the original 100 foot length, angled northeast along the railroad track from the boiler room in the south bay, and no part of the extensions was used for commercial work.
In addition to the production equipment purchased by the plaintiff for its Navy contracts, the defendant furnished the heat treating equipment, X-ray machinery and a substantial amount of the other special equipment required for contract production.
10. The booster was formed by a metal tube approximately 12 to 14 feet in length and 18 inches in diameter, made of a special type steel, and tempered to extremely high stresses. Such tubes could not be purchased. The sheet steel from which the tubes were made was about .097 inch in thickness. It was difficult to weld and required fabrication to very close tolerance to connect with nozzle and head rings. The tubes were tempered and stretched to a considerable degree after welding. All welding was X-rayed to detect any faults or defects in the welds which required correction before stretching.
Subcontractors produced the forgings for the nozzles and performed most of the machining, heat treating and X-ray of the welding under contract 11447. Special equipment was required for quantity production under contract 11861, which the plaintiff estimated would cost approximately $81,100 in excess of the original estimate under contract 11447. The defendant agreed to purchase this additional equipment under a separate equipment contract, blit no equipment contract was ever executed. The special equipment was all reimbursed under contract 11447, and required prior approval by defendant’s officials. Much of it required an NPA directive. The Denver flame hardener was not delivered and installed until January 1952.
*350 The principal units of this additional equipment consisted of a vertical tempering furnace installed in a pit, an oil trench bath, stretch forming equipment with pistons approximately 30 feet in length, welding equipment and X-ray equipment, and the Denver flame hardener.
11. No official drawings or specifications were provided in or with contract 11447. On March 21, 1951 the plaintiff wrote the defendant for official drawings from which work could be commenced. By letter of May 11, 1951 the defendant advised plaintiff:
1. One (1) blueprint copy of sketches, reference (a), have recently been forwarded direct to the contractor for information and guidance in connection with the fabrication of twenty-five (25) booster metal parts (exclusive of propellant and igniter) under Contract NOrd-11447. The list of drawings applicable to these booster metal parts will be forwarded in approximately two (2) weeks.
2. Sketches pertaining to the sustainer metal parts and their list of drawings are not yet available but will be forwarded in approximately two (2) weeks.
By letter of June 25, 1951, the defendant forwarded to the plaintiff, through the Inspector of Naval Material, at Milwaukee, three copies of Bureau of Ordnance list of drawing number 255956 dated 9 May 1951 and all Bureau of Ordnance sketches listed thereon and three copies of Bureau of Ordnance list of drawing number 255962 dated 7 June 1951 and all Bureau of Ordnance sketches listed thereon. This letter states in part:
3. The Bureau of Ordnance considers that compliance with above list of drawings is within the present scope of the contract. The design, as indicated by the above list of drawings should be incorporated in production as soon as practicable without obsolescence or reworking of material and should not delay delivery.
4. All proposed deviations to the above list of drawings should be submitted to the Bureau of Ordnance, via the Inspector of Naval Material, for consideration and approval prior to incorporating into production.
By letter of August 22, 1951, the defendant transmitted to plaintiff a copy of the latest revisions of Bureau of Ordnance list of drawing 255991 and all sketches listed thereon, advising, “complete instructions for incorporating these lat *351 est revisions into production will be forwarded within the next few days.” This constituted a portion of major changes reported in the following finding.
On September 24, 1951, the plaintiff wrote the defendant, through the Inspector of Naval Material, Milwaukee, in part:
We are pleased to advise that by the job shop method and by hand we have successfully produced sustainers and boosters, however, in order to successfully produce sustainers and boosters by production methods, the procedures must be properly refined, eliminating entirely any cause for errors or failures.
This letter referred to contract 11447, and requested additional funds be provided for refining the manufacturing procedures in the estimated sum of $100,000.
12. On October 4, 1951, the defendant wrote plaintiff in respect to changes in contract NOrd-11447, citing Bureau of Ordnance letter of June 25,1951, as reference (a), enclosing two copies of Bureau of Ordnance list drawing 255991 and all sketches listed thereon as enclosure (1) and M. W. Kellogg drawing S-0329, forward head, as enclosure (3). This letter reads in part:
1. The purpose of this letter is to change the specifications of Lot 4 Terrier Boosters and to confirm the procedure to accomplish the task under contracts NOrd 11447 and NOrd 11861.
2. The original contract was awarded on the basis of M. W. Kellogg drawings. The specifications were changed by reference (a) and production was requested to be in accordance with Bureau of Ordnance L. D. Number 255956 and L. D. Number 255962 and all Bureau of Ordnance sketches and specifications listed thereon. Keference (a) further requested all deviations be submitted to the Bureau of Ordnance via the Inspector of Naval Material for consideration and approval prior to incorporating into production. It is now necessary to further change the specifications. Bureau of Ordnance L. D. Number 255991 and all sketches and specifications listed thereon, Enclosure (1), supersedes Bureau of Ordnance L. D. Number 255956 and all sketches and specifications listed thereon. Bureau of Ordnance L. D. Number 255991 and all sketches and specifications listed thereon shall be incorporated into production as soon as practicable without delaying de *352 livery of the Boosters for test at Allegany Ballistic •Laboratory except for the following deviations:
a. Bureau of Ordnance Sketch Number 328865, Unit Assembly of Terrier Lot IV Booster Case, requires a hydrostatic pressure test of 1500 P. S. I. held from 3 to 5 minutes. It is now necessary to increase the hydrostatic pressure to 1575 P. S. I. held for 3 to 5 minutes. All Booster units submitted for test at Allegany Ballistics Laboratory and any subsequent production shall have passed the 1575 P. S. I. test at the Wagner Iron Works plant.
b. The Forward Head, Bureau of Ordnance Sketch 328867, is not to be incorporated into production. Enclosure (3) is forwarded to indicate the proposed changes in design that will be forthcoming. Bureau of Ordnance drawings covering the new design to be furnished the contractor in approximately three weeks. All Boosters shipped for test must contain the new design.
c. The Quick Arming Device, as shown in Enclosure (1), is not to be incorporated into production. The contractor is authorized to ship the test units to Allegany Ballistics Laboratory without Arming Devices. Any subsequent production must be in accordance with Bureau of Ordnance drawings to be furnished at a later date.
$ $ $ $ $
This letter further stipulated that the contractor engineer for production the metal parts and perform experimental fabrication of 20 sets each of the metal parts for the Terrier missile booster and sustainer, instead of the 25 sets originally called for; that five complete boosters and sustainers be furnished the ABL ior inspection and tests, and if the ABL reported the tests as satisfactory the plaintiff would be notified and authorized to complete the remaining 15 sets, using the same processes and identical material. In the event the tests were not satisfactory the plaintiff would be required to correct all deficiencies and submit a maximum of five additional sets for further tests, providing the process had sufficient merit to continue development.
In respect to contract 11861, the letter provided that the Bureau of Ordnance would authorize the plaintiff, in writing, to proceed with the manufacture of all units if the tests on the five boosters submitted to ABL were successful. And *353 upon the completion of the study to improve productibility under 11447, the plaintiff would be authorized in writing to convert to the new production methods, providing deliveries were not delayed and a reduction in cost resulted from the changes in specifications allowing the process deviations.
A conference was held between plaintiff’s representatives and officials of the Bureau of Ordnance at Washington, D. C. on October 9,1951, for the discussion of changes and production problems under the contracts. Minutes of this meeting were prepared by plaintiff’s Washington counsel, Robert S. Moss, which are filed in this case as plaintiff’s exhibit No. 14. At this conference it was determined that it would not be possible to ship booster cases to ABL until the drawings for the new forward head were received by the plaintiff and until the Bureau of Ordnance had clarified other drawings. It was finally agreed that the plaintiff should ship one booster case then completed with the forward head of the old design, and that four additional booster cases would be completed without forward heads, and that the defendant would furnish forward heads for testing the cases or furnish drawings for the new forward head with sufficient promptness so that the plaintiff would be able to fabricate the heads by shop methods from forged plates prior to the completion of new forging dies. Lieutenant Commander Hartman, technical administrator for missiles, Bureau of Ordnance, made it clear at this conference that the plaintiff should not commence production on contract 11861 until a release had been received from the Bureau of Ordnance on the basis of tests of the boosters furnished under 11447.
13. During October and November 1951 the plaintiff shipped five sustainers to the ABL at Cumberland, Md. The first static firing test of a sustainer was successfully made at the ABL on December 20, 1951. The welding and tensile strength were found satisfactory, and an examination of the unit after firing indicated that it was essentially unaffected by the firing test, except for considerable erosion of the graphite nozzle insert. The report of the test was not made to the plaintiff but one of its representatives was present at the time of the inspection.
*354 The carbon nozzle insert employed by plaintiff was a substitution of the grade proposed in the specification drawings which the plaintiff had requested authority to use because the National Carbon types specified carried a delivery date of approximately one year from the date ordered.
14. By letter of November 15, 1951 the plaintiff was requested to make two dimensional changes in sketch No. 328772 for the sustainer, which two changes had to be made concurrently, and requested the number of units that could not be converted. Following a further Washington conference the plaintiff reported on December 17, 1951 that six sustainers would be fabricated on dimensions originally given and all sustainers thereafter would be dimensioned in accordance with the Navy speed letter of November 15,1951.
15. By telegram of October 16, 1951 the plaintiff was advised to change the gauge on all undelivered booster shell steel from .097 to .1046 plus or minus .008, with authority to use all delivered material, provided that the finished boosters be subjected to test of 1500 PSI and that the wall thickness and hardness be stenciled three places on each booster shipped.
In November 1951 plaintiff’s research manager for its missile program was informed by Dr. Bonner of the ABL that it would be necessary to provide the new type of forward head for testing the booster. By Naval speed letter November 30, 1951, the plaintiff was advised that the design of the booster forward head shown on drawings 1331742 and 1331743, which was verbally authorized for use November 9, 1951 was inadequate and that further production of the forward head was not authorized, but that new drawings would be available December 10,1951.
By letter dated December 14, and received by plaintiff December 19, 1951, the defendant forwarded three copies each of Bureau of Ordnance sketches 248107, 248108 and 248110 and directed that the forward heads be manufactured in accordance thereto. In the meanwhile, the plaintiff’s research manager had obtained the revised prints from the ABL, and on December 12, 1951 wrote the Bureau of Ordnance that the new prints were not complete either, and that *355 plaintiff would be unable to proceed until more complete information was received from the Kellogg Company.
16. Following the major changes directed October 4,1951, and in addition to changes ordered by the Government, the plaintiff submitted ten separate requests from October 16, 1951 to J anuary 7,1952, for additional information on drawings covering errors, deviations and clarifications, also some material substitutions, suggesting the use of the same type of steel for parts requiring welding and heat treating, and the substitution of certain types of material because of delivery periods as long as 18 months. The plaintiff received but one reply approving the use of a certain type steel for four items.
It was found that the dimensional changes ordered by letter of November 15,1951 for the sustainer decreased the overall dimension required in another drawing by approximately %4th of an inch, and plaintiff proposed to lengthen the nozzle tube to maintain the overall length. No provision was found for tightening the retainer ring into position for test purposes, and plaintiff proposed to put two % inch slots in the ring on opposite sides and to fabricate a suitable wrench to tighten the retainer ring. In one instance the note on one drawing referred to another drawing that had not been furnished.
Allegany Ballistics Laboratory tested boosters and sus-tainers by determining if they were adequate pressure vessels and whether they had the proper dimensions so that they could mate with other missile components. The units contained some 10,000 items involving dimensions and drawings.
17. On January 10, 1952 a conference was held in Washington, D. C. and the plaintiff was represented by Robert S. Moss, its Washington attorney and Thomas Muchmore, a member of the firm of Washington Technical Associates. A memorandum of the conference, dated J anuary 16,1952, prepared by Wayne M. Wallace, one of the representatives of the Bureau of Ordnance, reads as follows:
The purpose of the conference was to advise the Wagner Iron Works representatives of the Bureau’s expectations with respect to Wagner Iron Works’ contracts for development and production of boosters and sustainers and components thereof and of the contem *356 plated action should these expectations not be realized. Commander Freeman advised:
(A) Wagner Iron Works must within 30 days produce and deliver two satisfactory sets of boosters and sustainers under contract NOrd 11447.
(B) On the basis of revised drawings, Wagner Iron Works must submit revised prices under contract NOrd 11861.
He further stated that:
(1) Additional funds as necessary to accomplish (A) will be provided under contract NOrd 11447. Upon delivery of the two sets the contract will be considered complete.
(2) The accomplishment of (A) above is a condition precedent to the Bureau’s execution of a certificate of eligibility for a guaranteed loan which Wagner Iron Works now has in process.
(3) If (A) is not accomplished and/or the price of (B) is not satisfactory, it is intended to terminate contract NOrd 11861 for the convenience of the Government.
The question was raised as to whether Wagner Iron Works was in possession of adequate drawings as to make the accomplishment of (A) feasible.
Lt. Cdr. Hartman advised that the specifications consisted of:
Booster — BUOND L. D. 255991 and all sketches listed thereon except the forward head, which shall be fabricated in accordance with drawings 248107,248108 and 248110.
Sustainer — BUOKD L. D. 255962 and all sketches listed thereon.
It was decided that it was probably feasible, that it would be confirmed in a few days, and assuming confirmation, the time for completion of performance was established as one month from 15 January 1952, or 15 February 1952.
The revised specification drawings for the booster and sustainer cited in the above memorandum were furnished the plaintiff October 4, 1951 and the drawings for the forward head were transmitted by letter of December 14,1951.
On January 16, 1952 the plaintiff wrote the defendant in respect to the January 10 conference, confirming the memorandum set forth above, except in regard to requirement (B) for the revision of the prices of contract 11861, which states *357 “such, fixed price to include igniter and arming devices which are now not covered by that contract.” Arming devices were specifically excluded from contract 11861. Neither were any provided for in contract 11447.
The plaintiff’s letter further states in part:
Upon receipt of these instructions a detailed analysis was made of all drawings. Upon the basis of this analysis we found ourselves required to advise Lt. Cmdr. Hartman that the drawings were not in fact sufficiently complete to permit us to state categorically that we were in a position to comply with the Bureau’s instructions. Specifically we advised Lt. Cmdr. Hartman that of the three (3) Bureau sketches modifying the new forward head drawing LD 255911, eight (8) supporting drawings referred to in that sketch bearing Kellogg No. 164525 had never been furnished to us, and that in addition there were twenty-two (22) other items which may or may not have been made obsolete by the changes in the forward head effected by LD 255991 and the modifying Bureau sketches. We are now advised that Lt. Cmdr. Hartman has confirmed the existence of the deficiency and has advised us that we may consider the Bureau’s instructions referred to above modified to the extent of requiring us to fabricate the two (2) complete boosters and sustamers in accordance with current drawings, including those applicable to the igniter and arming device excepting that, the forward head shall be fabricated to drawing No. 328867, the next to the last revision of forward head, modified however so as to increase the thickness thereof to one quarter inch (%") and to increase the diameter of the boss thereon to ten and one-eighth inches (10%").
As so modified, we are willing to attempt to comply with the Bureau’s instructions, however increasing the diameter of the boss will require the fabrication of two (2) new forged heads and will further require either modification of the arming device or milling out clearance in the ten and one-eighth (10%") diameter boss. The latter will probably be necessary. Unless otherwise instructed we will use our own judgment in determining whether or not to modify the arming device or mill out the boss.
The defendant thereafter authorized certain specific revisions. By letter of January 28, 1952 plaintiff was authorized to ship the sustainers without the hydraulic fittings *358 that were to be furnished by the Government. On January 29 plaintiff was advised that spot welding would be acceptable under 11447, but that Bureau of Ordnance specifications would be available prior to the release of production under contract 11861. By letter of January 31 plaintiff was authorized to increase the length of the nozzle tube to maintain the overall length of the sustainer. By letter of February 1,1952 the plaintiff was authorized to provide slots for securing the retainer ring. On the same day the plaintiff was advised by Naval speed letter of seven other items upon which inquiries were made. This states in part:
1 — Adjustments are to be made as contractor considers appropriate in order to permit the arming device to function for the two boosters to be submitted for test under NOrd 11447. New drawings will be available prior to the release of production on NOrd 11861.
The complete drawings were never furnished, but plaintiff was told to do the best it could. At that time the Navy had only commenced work on the arming device.
By Government bills of lading the plaintiff shipped the two sustainers to the ABL on February 8 and the two boosters on February 12 and 14,1952.
18. No firing tests were conducted with the two boosters delivered. They were tested for dimensions, strength and other manufacturing accomplishments. The defendant’s officials who made the inspection and tests of the units furnished by plaintiff were cognizant of the fact that there were discrepancies between the drawings used by the plaintiff and the inspection forms used in checking these units. There were minor errors in the drawings that could not be discovered in manufacturing, and the ABL was called upon at various times to submit clarifications for both the manufacturer and the Navy. The drawings were never finalized for the plaintiff.
The shell of the first booster was found to vary in thickness as much as .06 inch and it was felt that it might burn through in a firing test, and in both boosters the ABL officials felt that the nozzle might bum through prior to the consummation of the propellant charge, but they were considered usable.
*359 There is no satisfactory evidence that any further tests were made of the two additional sustainers shipped to the ABL February 8, 1952. Satisfactory tests were made of a sustainer in December 1951 from deliveries of the early design, as reported in finding 13. The plaintiff was never advised by any Navy official or the ABL whether or not the two sets of boosters and sustainers delivered in February 1952 were satisfactory or unsatisfactory. However, by letter dated March 11, 1952, citing the conference of January 10, 1952 as reference (c), the Chief of the Bureau of Ordnance advised plaintiff, in part, as follows:
By reference (c), Contract NOrd-11447 was to be considered complete upon the delivery of two (2) Boosters and Two (2) Sustainers for inspection and tests at Allegany Ballistics Laboratory.
The plaintiff submitted a progress report April 10, 1952 detailing the engineering and manufacturing processes performed on the booster and sustainer under contract 11447.
It is reasonable to conclude that plaintiff’s performance under contract No. 11447 in the engineering of boosters and sustainers for production was satisfactory.
19. The development of the Terrier missile was conducted under the direction of the Allegany Ballistics Laboratory, and the M. W. Kellogg Company was engaged in this work from 1947 until about 1954. Also S. A. Hicks & Company, of Boston, had been awarded a development contract No. 11446 for boosters and sustainers about the same time as plaintiff’s No. 11447 was awarded. The Hicks company was later awarded a production contract No. 12330, identical with plaintiff’s No. 11861, but issued much later.
Units were submitted for tests by both of these other firms, all of which contained deviations. The Hicks company first produced a light, forward head, which was later changed to a heavier type. This company also had difficulty in welding the thin tube walls. Two boosters from other manufacturers were tested and failed hydrostatically, but there were no weld blowouts.
The defendant’s officials considered that the plaintiff’s contributions in the development of the missile parts were less than those of certain other manufacturers, whose pro *360 posed prices on production were more favorable. No substantial production had been commenced by the end of summer in 1952, when Captain Freeman left the Bureau of Ordnance.
20. On February 15, 1952 plaintiff’s counsel, Robert S. Moss, wrote the Bureau of Ordnance, Department of the Navy, in further reference to the conference of January 10, 1952 in respect to the revision of the price of plaintiff’s production contract No. 11861 which would be amended to include ignition and arming devices. This letter stated that the plaintiff’s estimated cost of the ignition and arming devices was $1,669.64, as it was currently designed, and further stated in part:
if the Bureau was disposed to negotiate a price for the igniter and arming device alone, as an extra under the “extra’s” clause of the contract, the operation of the price redetermination clause would provide a method for ultimately arriving at a fair and equitable price for a complete booster and sustainer, including the igniter and arming device.
However, it appears that the Bureau’s position is that the new fixed price that is to be agreed Upon, is to be agreed upon without reference to the original price and the igniters and arming devices as an extra, and without regard to the price redetermination clause — in effect a new over-all price.
Based upon the foregoing, the contractor has authorized the undersigned to advise the Bureau of its willingness to agree to an amendment of the referenced contract to call for the delivery of 300 missile boosters Mark 2, Mod. 0, and 300 missile sustainers, Mark I, Mod. 0 complete with igniter and arming devices and based upon present drawings, at $7,895.00 per unit; each unit to consist of a complete missile booster and complete missile sustainer. % * *
It was pointed out that the price of $7,895 per unit was exclusive of the estimated cost of $24,047 for tools, dies, jigs and fixtures for the arming and igniter devices, which were considered reimbursable under contract 11447 under the heading “Government-furnished property”.
On March 11, 1952, the Bureau of Ordnance wrote plaintiff, citing its letter of February 15,1952, as reference (d), in part as follows:
*361 2. A fixed price contract at a unit cost of $7,895.00 for a Booster and Sustainer is not acceptable to the Bureau of Ordnance. It is suggested that the matter be further discussed in the Bureau. A meeting will be arranged upon request.
21. A final conference was held between plaintiff’s and defendant’s representatives at the Bureau of Ordnance in Washington March 18,1952, for the purpose of determining whether or not a downward revised price could be negotiated for plaintiff’s production contract. The plaintiff’s counsel wrote the Bureau of Ordnance on March 19, 1952 in confirmation of plaintiff’s position taken at this conference which reads in part as follows:
As previously indicated, this meeting was held yesterday. At this meeting, the contractor advised the Bureau that it was willing and anxious to cooperate with the Bureau in its efforts to bring the cost of terrier missile boosters and sustainers down to the lowest possible level but that, based upon the present status of the drawings and specifications, and upon the previous experience of the contractor with the program, a price of less than $7,895, as proposed by the contractor in its letter of February 15, was not possible, but that the contractor was willing to continue in effect the present price redetermi-nation clause, and to make that price subject to redeter-mination at any level that the Bureau wished to set. However, the contractor pointed out that on the basis of the present sketches, and in view of the representations made at the meeting, final drawings and specifications for boosters, sustainers and arming devices were in process, that it would be impossible to accept a contract price at this time of less than the amount proposed. The contractor also pointed out that in the price of $7,895 there was a minimum of $1,800 per unit to take care of costs, which are completely within the control of the Bureau. If definitive plans, specifications and inspection procedures are established, and if the design is fixed so that the number of changes made is limited, a saving of at least that much per unit would result during the production period.
Bureau representatives advised the contractor that the new price was not acceptable. Apparently, on the basis of proposals made by contractors now desirous of getting into the program, the ammunition branch is of the opinion that the new price is too high. * * *
*362 The meeting was closed with indications from Bureau representatives that the price was unsatisfactory and that consideration would have to be given to cancellation of the contract.
The plaintiff received no reply to the above letter even though an answer by return mail was requested. During the week of April 7, Navy representatives visited plaintiff’s plant. They inquired of the plant manager his opinion of how long it would take the contractor to get into production under contract 11861, if released by the Bureau, but in the absence of final drawings he was unable to furnish any information on the preparatory work.
The testimony of a civilian consultant for the Bureau of Ordnance (Leo R. Poliak) is that a price of approximately $5,100 per unit was submitted by the M. W. Kellogg Company, $5,600 by the Hicks company and $5,700 by General Motors Corporation for the assembly of the booster and sus-tainer complete with the ignition and arming device. And by reason of known available sources at prices below that of the plaintiff, Commander Hartman recommended the termination of plaintiff’s contract No. 11861.
Plaintiff’s contract No. 11861 was terminated, effective May 8,1952, for the convenience of the Government under Article 21 thereof.
22. The plaintiff was paid the net sum of $414,068.55 on contract NOrd 11447 on 19 partial payment vouchers submitted, commencing in May 1951 to December 3,1952. The vouchers contained actual direct labor, with factory burden at 150 percent of direct labor, engineering labor plus 50 percent factory overhead on the same and general administration expense at 17.5 percent of total of direct labor, engineering labor and all factory burden. Materials, supplies and special equipment costs were detailed in these vouchers, with paid subvouchers attached for most of the items claimed.
Except for minor adjustments resulting from current audits of the plaintiff’s payrolls and time records and other suspensions and disallowances for materials and equipment which had not been previously approved, the plaintiff was paid the overhead at the percentages claimed for the first seven vouchers covering the period to August 11,1951. All *363 overhead was suspended on the next several vouchers pending a review of the plaintiff’s records. Commencing with voucher No. 11 for the period October 7-20, 1951, the defendant’s cost inspector restored factory burden at 100 percent of direct labor costs, with 50 percent on engineering labor, and these rates were paid thereafter until May 9,1952, covered by voucher No. 16.
Following the termination of contract 11447 plaintiff was instructed to continue to voucher costs under this contract instead of filing a formal termination claim. Upon the completion of a review of plaintiff’s cost experience for 1951, factory overhead rates were readjusted by the defendant’s cost inspector at approximately 75.9 percent on direct labor, 51.7 percent on engineering labor and 14.25 percent on all factory labor and overhead for general administration expense, equivalent to approximately 6 percent on total factory costs, including material.
Net suspensions by the cost inspector of $108,826.95 consisted largely of overhead expense claimed, which remained in dispute. Disallowances of $40,644.38 included the sum of $17,908.48 for plaintiff’s Washington counsel, which was also in dispute.
A summary of the classifications for which plaintiff was paid, after all suspensions and disallowances, follows:

*364

The plaintiff’s Washington Technological Associates were paid for 83% days at $130 per day, pins $1,047.59 expense. The plaintiff also paid $17,908.48 to its Washington attorney on contract 11447 which was submitted for refund with paid vouchers. Plaintiff was notified that these payments were all suspended, but the last vouchers for March 1952 were paid in the sum of $462.50 on partial payment voucher No. 16.
23. Commencing in November 1951 the plaintiff submitted vouchers for partial payments under contract NOrd 11861. Under item I of the contract for the production of 300 sets of boosters and sustainers, the plaintiff’s vouchers were prepared on the basis of its estimate of 23.6 percent for material, 57.3 percent for shop and engineering labor and factory burden, 4.3 percent for office overhead, 5.7 percent for general administration overhead, and 9.1 percent for estimated profit. Item II was for materials only for 200 additional sets.
Prior to termination of this contract, the plaintiff had submitted five vouchers under item I and three vouchers on item *365 II. These vouchers covered the cost of material only with an apportionment of estimated profit under item I. After deducting a retainer of 25 percent under item I and 10 percent of amounts claimed under item II, the plaintiff was paid the sums $92,311.06 under item I and $71,489.26 under item II.
Following the termination of contract 11861 the plaintiff prepared inventories of materials, supplies and parts acquired for the performance of the contract. These lists were prepared on forms supplied by the defendant under various dates from June 12 to July 18, 1952 and furnished the defendant for proper disposition.
On July 21, 1952 the plaintiff submitted settlement proposals separately for items I and II of contract 11861. The amounts claimed for materials were based upon the inventories submitted. Having acquired substantially all the material for the contract the plaintiff claimed overhead on the basis of 23.6 percent performance of the contract. The total amount claimed under item I was $749,987.24, less the prior payments of $92,311.06, and the amount claimed under item II was $277,438.49, less prior payments of $77,489.26.
24. The Navy Cost Inspector at Milwaukee made an examination of plaintiff’s books and records for the purpose of determining the costs incurred on the terminated contract 11861. A report thereof was issued under date of September 6, 1952, and filed in this case as defendant’s exhibit No. 41. It was reported that the percentage of completion, based upon materials, would not necessarily apply in the determination of allocable overhead expense. After reporting plaintiff’s accounting system and internal control, this report stated in part:
The facts presented in the previous paragraph are the basis for determining that the contractor’s claim for indirect factory expense is not predicated on a method of allocation which can be accepted as equitable to the Navy and likewise the contractor’s normal method of allocating indirect factory expense on the basis of a percentage to direct labor dollars would be inequitable to the contractor, therefore some other basis must be used which would yield a reasonable consideration for indirect factory expenses relating to the terminated contract. * * *
*366 The cost inspector reported that it would not be feasible to anaylze all overhead accounts for portions assignable to the contract, and determined that factory overhead should be determined upon its relationship to both direct labor and materials, and the percentage so determined be applicable to the material costs in plaintiff’s settlement proposal, excepting $68,000 of such materials that were delivered direct to a subcontractor by the vendor.
In respect to the general administration expenses, the cost inspector reported in part:
In determining the amount of general and administrative expenses allocable to this contract it is necessary to consider simultaneously the basis for allocation to contract NOrd 11447. Consistency demands that the same basis be used for allocating these expenses to both contracts and cost memorandum 2, paragraph 3 (i) makes it mandatory that the same basis be used.
The cost inspector excluded for consideration under contract 1144:7 only abnormal costs in finding sources of materials, engineering labor and indirect expense, and the cost of guards and watchman. The unamortized cost of shop No. 2, claimed in the sum of $114,268.48, and attorney fees, claimed in the total sum of $32,925.01 on both contracts, were recommended for negotiated settlement. The cost inspector reported that approximately 50 percent of the floor space of shop No. 2 was still occupied by Navy-owned equipment.
In the meantime the plaintiff submitted partial payment vouchers under its settlement proposal for reimbursement. The third partial payment voucher under the settlement of 11861 submitted by the plaintiff October 2, 1952 for items I and II contained the following items for which payments were received by the plaintiff:

*367

In submitting the third voucher to the Chief of the Bureau of Ordnance on October 9,1952, the Inspector of Naval Material at Milwaukee reported his understanding that the actual cost of materials, tools, dies, jigs, fixtures, etc., and the amount of the prime contractor’s settlement with subcontractors would be the amount ultimately reimbursed.
The plaintiff received payments of $287,998.28 under item I of its production contract 11861, and $112,001.71 for item II materials for the 200 additional sets of boosters and sus-tainers.
25. Most of the materials under item II of contract 11861 had been previously shipped to S. A. Hicks & Company of Boston. Following termination of both contracts the plaintiff prepared inventories of materials and equipment and requested shipping instructions for its disposition. Some of the Government owned equipment was shipped to the Houdaille-Hershey Corporation of Decatur, Illinois and some to the Hicks company.
Some of the material was shipped to the Camden Iron Works of Houston, Texas. By letter of September 4, 1952 the plaintiff was advised by the Inspector of Naval Material to ship all material on which shipping instructions had not previously been issued under items I and II of contract 11861 to S. A. Hicks & Company for the attention of the Inspector of Naval Material at Boston, and requested advice from plaintiff when the material would be ready for shipment so that Government bills of lading could be prepared. At that time Commander Hartman had left the Bureau of Ordnance and was employed by the Hicks company.
Some of the obsolete material was sold to the Ladish Drop Forge Company, some was sold as scrap and there was some remaining at the Kropp Forge Company as late as 1955. *368 Contract drawings and sketches were disposed of in accordance with instructions of the Inspector of Naval Material.
26. The plaintiff was advised to continue to voucher and submit its costs on contract 11447 in lieu of any formal termination claim. Partial payment voucher No. 17 was submitted on July 21,1952. Factory overhead had been paid at the rate of 100 percent on direct labor and 50 percent on engineering labor.
On August 21, 1952 the Navy cost inspector reported to plaintiff suspensions covering all estimated termination expense, a reduction in factory overhead to 70 percent on direct labor and 35 percent on engineering, pending an uncompleted examination of plaintiff’s 1951 costs, and a disallowance of plaintiff’s entire claim for legal expense for its Washington counsel, Robert S. Moss, in the sum of $17,908.48. Factory overhead was later readjusted to approximately 76 percent of direct labor, based upon a completion of the examination of plaintiff’s 1951 cost experience, as reported in finding 22. A Navy cost inspector also examined the records of plaintiff’s attorney Robert S. Moss in Washington, D. C., and submitted a report thereof on April 24, 1952. The inspector reported that the number of hours chargeable against contract 11447 were substantially correct and that his expenses were considered fair and reasonable, and that such services and expenses were properly related to the performance under contract NOrd 11447.
Notwithstanding the report of the Cost Inspection Office at Silver Spring, Maryland, the cost inspector at Milwaukee disallowed reimbursement to plaintiff of any part of the payments to its Washington legal counsel. On or about October 10,1952, the plaintiff appealed from the determination of the cost inspector at Milwaukee.
Thereafter the Director of Navy Cost Inspection Service issued an undated decision, which was transmitted to the plaintiff about March 2, 1954, that it was his determination a fair and reasonable allowance for attorney’s fees and expenses was the sum of $7,014.73. The plaintiff appealed this decision to the head of the department on March 24,1954.
On November 30,1955, the Armed Services Board of Contract Appeals issued its decision on the question of allowance *369 of attorney’s fees and expense under contract NOrd 11447. The board held that the attorney’s invoices for the months of February and March 1951 were not reimbursable because any legal expense in negotiating a contract was not a recoverable cost, and the March invoice was not segregated for a determination of services rendered after the award of the contract on March 8, 1951. It was also held that the cost of obtaining the Certificate of Necessity for the construction of the building, known as shop No. 2, in the sum of $750 was properly classified as general overhead expense, and allocable under that category. The board held that the plaintiff was entitled to reimbursement for $14,793.06 under contract NOrd 11447, consisting of the following sums:

The plaintiff also protested the suspension of overhead allowances under 11447, and employed Lee B. Gavigan, C. P. A. to make an audit and determination of proper overhead allowance for reimbursement. By letter of January 15,1953 the plaintiff submitted the auditor’s report to the Navy Cost Inspector in Charge, requesting a final determination of allowances in order that an appeal might be made. This audit reported reimbursable costs under contract 11447 of $480,-029.76, including $73,652.79 factory overhead, $10,334.64 drafting overhead, and office and administration expense of $39,927.17.
By telegram dated February 6,1953, the plaintiff requested a final determination of reimbursable cost under contract 11447 to the Cost Inspection Central Area office at Chicago. On February 11, 1953 that office advised plaintiff that an auditor from the Milwaukee branch office would call at plaintiff’s office in approximately one week to complete the cost inspection audit on contract 11447.
No determination was made by the Navy cost inspection service or the contracting officer on reimbursable overhead allowance under contract NOrd 11447. The plaintiff submitted a final voucher for reimbursement under contract 11447, but withdrew it because of the unresolved dispute on overhead expense allowances on this contract as well as con *370 tract 11861, and the necessity of a concurrent settlement on both contracts for this class of expense.
While the plaintiff was reimbursed for the direct costs of special equipment, tools, etc. under contract 11447, the overhead costs of acquiring priorities, locating sources to supply them, the installation of this equipment as well as other Government furnished equipment, and the enlargement of shop No. 2 to house this additional equipment was primarily for later production under contract 11861. The plaintiff could not reasonably accept any settlement of factory and general overhead costs on contract 11447, based upon direct productive labor on this contract, unless the indirect costs for preparatory work for production were determined for reimbursement under the same contract or contract 11861.
27. The plaintiff’s termination claims under contract 11861, with indirect costs based upon a percentage of completion formula, were rejected by the Navy Cost Inspector. Conferences were held with the local cost inspector in Milwaukee, September 3-5, 1952 for the purpose of devising a reasonable method of apportioning overhead expense to the terminated contracts. The cost inspector took the position that it was incumbent upon the plaintiff to prove its indirect costs in each category, and to obtain statements of workers performing indirect labor for time spent on contract work.
Numerous conferences were held at the Bureau of Ordnance of the Navy Department in Washington with plaintiff’s officials and attorneys during the period October 1952 to about May 1953. During negotiations and up to the end of 1952, the defendant had made partial payments on contract 11861 to the extent of $400,000 as reported in finding 24.
On February 12, 1953, the plaintiff filed its claim in the United States Court of Claims for damages on an alleged breach of contract 11861.
On May 26, 1953, the plaintiff advised the defendant that because of differences in opinion as to proper allowable costs on its terminated contracts, plaintiff had employed the audit firm of Peat, Marwick, Mitchell & Company to make findings and recommendations, and upon the receipt of their report the defendant would be advised. No determination was made *371 by tlie contracting officer upon tire allowable costs under contract 11861.
28. On April 15, 1954 the plaintiff’s auditors submitted their report on the costs of both contract 11447 and 11861 and termination expenses. This audit was a comprehensive report, covering all phases of the performance on both contracts. The auditors reported that because of the concurrent activities on both contracts allowable costs and expenses were determined under both contracts. It was then suggested that upon the determination of allowable fees for plaintiff’s Washington representative and attorney, other costs under 11447 be resolved and settled upon the basis of the Navy cost inspector’s recommendation, with provision that the residual costs on the Navy contracts be settled under 11861. The plaintiff agreed to negotiate for the settlement of both contracts in this manner.
Copies of plaintiff’s accounting report were furnished to the Navy Bureau of Ordnance, and upon review by the contract division, the plaintiff’s accountants were requested to attend a conference at the cost inspector’s office July 6-7,1954. Following the adjournment of the conference July 7, the plaintiff’s accountants prepared a further report dated July 13, 1954 for the clarification of certain matters discussed. Thereafter further conferences were held in Washington in attempts to arrive at a settlement. A conference held in Washington about September 23,1954 was terminated by the Navy officials, pending the completion of an FBI report of an examination of plaintiff’s records.
The FBI examination was commenced in September 1954 and covered approximately one year. A final conference was then held at the Bureau of Ordnance about October 19,1955 but plaintiff’s accountants were not permitted to attend this conference, and no further negotiations were had on the termination claims. No determination for allowable costs was made by the contracting officer on either contract. Following this conference the plaintiff filed its first amended petition on November 7,1955 to include its termination claim on contract NOrd 11861.
*372 Reimbursable Costs and Expenses
29. Direct costs. Certain direct costs and drafting expenses have been agreed upon between the parties which are ' applicable to the Navy contracts as follows:

The materials for contract 11447 consisted not only of the materials embodied in the boosters and sustainers being engineered for production, but also for reimbursements for special equipment, tools, dies and parts, as well as subcontract costs and outside engineering, as set forth in finding 22, less credits for scrap and materials retained. The materials under items I and II of contract 11861 actually cost $226,195.52 and the sum of $197,970.14 represents the reimbursable amount after all credits to the Government.
There was no performance authorized on contract 11861, but the required machinery set-up for running off certain small components for 11447 justified a run off of all such components required on the production contract. Thus, the direct labor engaged in this work amounting to $629.84 was allocated to 11861 for the components produced, and agreed upon between the parties.
30. Indirect factory expense. The period of performance and termination work involved in the terminated contracts was from March 9, 1951 to June 30, 1952, and both sides in this controversy have adopted this period for allocating overhead expenses to the contracts in suit. Although preparatory work for the production contract 11861 proceeded for approximately one year, there was no production authorized or performed on this contract. Substantial portions of the work on contract 11447 in engineering for production was subcontracted. The conventional method of allocating indirect factory costs on the basis of direct factory labor was *373 inapplicable in these circumstances. Both sides recognized this. Both sides agreed that the indirect expense on the Navy contract work is inseparable as between the two contracts. Thus, the amounts previously paid on contract 11447 would be deducted from the total amount of indirect cost determined for Navy contract work for the determination of such costs on 11861, and this pattern was adopted by each of the parties.
In pursuance of the request of the Navy cost inspector and in an attempt to determine a fair and reasonable allocation of factory expense the plaintiff’s accountants made a study of all indirect expense accounts for the period involved. Various bases were used in allocating such costs to Navy contract work. Certain accounts that related wholly to commercial work were eliminated from any allocation to Navy contracts. Indirect labor was redetermined from all factory expense accounts and was allocated in part upon the basis of statements of the individual employees performing the work, and in part upon the job sheets in which the indirect labor was shown to have been applied. Other indirect factory expense accounts were grouped into a number of similar classifications and they were allocated by individual accounts or groups in accordance with the determinable direct and indirect costs to which they were related. This method was applied for both factory indirect expense as well as general administration expenses in making allocations to the Navy contracts.
The plaintiff’s accountants were engaged on this work for about ten months and performed an immense amount of detailed work. In their original report issued April 15, 1954, all indirect costs allocated to shop No. 2 were not charged to Navy contracts.
31. Thereafter, in October 1954, A. A. Wagner, the then president of the plaintiff company, confessed that certain personal expenses which had been paid through the company office had been charged to the corporation expense accounts rather than to his personal account which is the usual and proper practice. These items had not been discovered nor adjusted in the plaintiff’s original claim submitted to the Navy Department. Neither were they discovered by plain *374 tiff’s accountants in their first analysis of plaintiff’s indirect expense accounts and audit. Thereupon the plaintiff caused an independent investigation to be performed by Peat, Mar-wick, Mitchell & Company, under a separate supervisor of that office. This investigation disclosed that $79,009.72 of personal expenses had been paid and charged to the company accounts during the Navy contracts period. Most of these items were the personal expense of A. A. Wagner, but they also included some items of A. J. Werner, some of which were paid and adjusted only after this case was pending in this Court. A more complete report of these items and other irregularities will be made under the section of this report on “Allegations of fraud”.
32. Most of these personal expenses had been charged in plaintiff’s records as direct materials and job costs. Such items amounted to $49,683.24, none of which had been charged or claimed under its Navy contracts. Other items amounting to $4,194.56 had been charged to certain indirect expense accounts for travel and entertainment and related selling expense, no part of which was allocated to Government work. Charges to factory overhead expense accounts amounted to $19,008.75 and to general administration expense accounts of $6,173.17 had been distributed in part to its Navy contract costs and claimed under them.
Upon the completion of the determination of these personal expenses in plaintiff’s accounts, revised schedules of factory overhead expense were prepared and filed as plaintiff’s exhibit No. 107, with allocations to shop No. 1 as commercial work and allocations to shop No. 2 as Navy contract costs. Eevised schedules were also filed for general administration expense as plaintiff’s exhibit 109.
Detailed schedules of the personal expenses of Wagner and Werner, as well as many of the invoices, were furnished in evidence. It is found that the plaintiff’s revised schedules have excluded all such personal items except certain heating oil invoices for which the corporation paid $526.70. This sum was charged to the factory fuel account which had been allocated to shop No. 2 at 21.36 percent, or the sum of $112.50. By deleting this amount shop No. 2 factory expense is reduced from $264,106.88 to $263,994.38.
*375 The plaintiff’s revised schedules were also adjusted for certain items not allocable to its Navy contracts, consisting of $1,568.43 for the cost of an automobile transferred to the widow of a minor official of the company, $125.91 office supplies and $201.65 for medical services. These revised schedules were also adjusted for a partial refund of prepaid premiums for liability and workmen’s compensation insurance, based upon the final audit of plaintiff’s payrolls by the insurance company.
33. The plaintiff claims reimbursement under its Navy contracts for all factory overhead expense allocated to shop No. 2 in its revised schedules, as adjusted in the amount of $263,994.38. The defendant agrees with plaintiff’s allocations of factory expense to shop No. 2, but contends that a portion thereof is properly applicable to the commercial work that was performed in shop No. 2.
The south bay of shop No. 2, covering approximately one-fifth of the main building, exclusive of the extensions, was equipped for commercial work. The remainder of the building with extensions thereto contained installations, machinery and equipment for production under the Navy contracts. The principal commercial production in shop No. 2 consisted of the cylinders and valves for the front end loaders that were being manufactured and assembled in shop No. 1. Taping machines were largely assembled in the warehouse adjacent to shop No. 2. The workers in shop No. 2 were employed primarily for missile work under plaintiff’s contracts, and were switched from commercial work to Navy contract work whenever such work could proceed, since the missile program had priority at all times.
Since the commercial work performed in shop No. 2 consisted largely of cylinders and valves it is reasonable to conclude that factory overhead expense applicable to such work would not be greater than the allocable factory overhead expense for the main plant where all other commercial production was performed.
34. Direct labor and indirect factory expense for the period March 1,1951 to June 30,1952 follows:

*376

Shop No. 1 was engaged exclusively on commercial production, except during the period prior to the completion of the main part of shop No. 2 in June 1951, when $7,340.13 of direct labor on Navy contract 11447 was performed in. shop No. 1. Indirect factory expense at the rate of 77.81 percent of direct labor has been agreed upon and paid on contract 11447. The amount of such indirect factory expense applicable to contract 11447 from shop No. 1 is the sum of $5,711.20.
Indirect factory expense for shop No. 1 also includes $37,502.37 for spray painting, research and development expense and other small expense accounts, no part of which was allocated to shop No. 2 commercial work nor to the Navy contracts.
By deducting factory expense of $5,711.20 assigned to Navy contract 11447 and the sum of. $37,502.37 not applicable to commercial or Navy work in shop No. 2, the remaining factory expense of $659,892.15 for. shop No. 1 represents 73.38 percent of the commercial direct labor performed in shop No. 1. Indirect factory expense of shop No. 2 properly applicable to the commercial work performed in that shop is 73.38 percent of the commercial direct labor, or the sum of $123,033.10.
The remainder of shop No. 2 indirect factory expense of $140,961.28 is reasonably assignable to the Navy contracts. Since $52,908.26 has been agreed upon for assignment to contract 11447, the remainder is properly assignable to contract 11861 in the sum of $88,053.02.
35. General and administrative expense. The plaintiff claims $126,890.69 of its general and administrative expense as reimbursable costs under its Navy contracts. The plaintiff based its analysis upon group classifications from A to G for allocation between its Navy contracts and commercial work. In the pursuit of this method the plaintiff’s accountants relied substantially upon statements by officials and other em *377 ployees for the portions of their time engaged upon missile work in allocating their salaries. Other classifications were allocated in large part upon these salary allocations, so that a substantial portion of the allocations to Navy contract work was predicated upon the memory and statement of a comparatively small group of officers and employees.
A fair and reasonable method of allocating general and administrative expense to the Navy contracts would be the adoption of the same percentage of allocable expense as that applied in distributing indirect manufacturing expense.
The total manufacturing expense for the period of March 1, 1951 to June 30, 1952 was $967,100.10, less non-allocable expense of $37,502.37 which was applicable to commercial work only, leaves allocable factory expense of $929,597.73. The allocations to Navy contracts of $146,672.48, reported in finding 34, represents 15.78 percent of such factory expense.
The plaintiff’s general and administrative expenses for the period March 1,1951 to June 30,1952, after adjustments for all personal expense reported in findings 31 and 32, and after the exclusion of any salary for A. A. Wagner, were $1,186,503.37.
During the same period the plaintiff’s sales expense and other costs relating wholly to its commercial operations were $669,953.75 and are not subject to allocation. The remaining $516,549.62 general and administrative expenses are allocable to both commercial work and the Navy contracts. By applying the manufacturing expense ratio of 15.78 percent to $516,549.62 general and administrative expense gives the sum of $81,511.53.
Since the sum of $36,706.45 has been agreed upon for assignment to contract 11447, the remainder is properly assigned to contract 11861 in the amount of $44,805.08.
36. The plaintiff incurred reimbursable costs of $11,976.10 for freight and material processing under contract 11861, of which $8,104.12 was for item I and $3,871.98 for item II material.
37. The plaintiff incurred costs of $11,528.75 for guards and watchmen during the period of the contracts. The plaintiff had never employed guards prior to the contract period and they were employed wholly as a security measure *378 on the contract work. The contracting officer has allowed and paid $5,770.07 for guards under contract 11861. This amount is found as a reasonable cost for protection of the Navy contract work.
38. The plaintiff paid its Washington counsel, Robert S. Moss, the sum of $17,908.48 for services rendered in connection with contract 11447 and $5,016.53 on contract 11861 prior to termination.
Upon appeal for reimbursable allowances under contract 11447, the Armed Services Board of Contract Appeals awarded the sum of $14,793.06. The Board excluded all charges for March 1951, since no reimbursements under the contract could be allowed for services rendered for negotiating the contract and there was no segregation of charges for March 1951, before the Board. The plaintiff has now shown that charges by its counsel after the award of the contract from March 9 to 31, 1951 were $991.37. However, on the evidence before the Board its determination was fair and reasonable.
The attorney’s charges for services and expenses on contract 11861 during the period August 1951 through April 1952 were $5,016.53 and are hereby determined to be fair and reasonable.
39. Settlement expenses. Subsequent to the termination of plaintiff’s contracts, the plaintiff incurred and paid the following settlement expenses for which there is no dispute in respect to their reimbursement:

*379 40. The plaintiff paid the Magnaflux Corporation a fee of $250 under a license agreement dated December 14, 1951. Magnaflux was required in connection with the X-ray processing of welds to determine any defects. The license was acquired for production under contract No. 11861 and is a fair and reasonable cost.
41. The plaintiff paid Charles Nagel and Associates a $500 fee and $49.85 expenses for an engineering survey and report on the special construction of shop No. 2 and the guardhouse for a determination of the proportion of costs reimbursable under contract 11861. The reimbursable allowance for special construction was ultimately agreed upon between the parties.
The engineering fee and costs of $549.85 is fair and reasonable for services rendered in connection with the settlement of special construction allowances under contract 11861.
42. The plaintiff employed Lee R. Gavigan, CPA, to examine its records and assist in negotiating settlements of the terminated contracts. This accountant issued a report of his examination and attended conferences on settlement negotiations during the period October through December 1952. The plaintiff paid Gavigan $1,443.24 for his services and reimbursement of travel and other expenses. This cost was fair and reasonable and was necessary in connection with the efforts to arrive at a settlement of plaintiff’s contracts. It is apportioned in part to contract 11447 in the sum of $426.16 and to contract 11861 in the sum of $1,017.08.
Thereafter the plaintiff employed the accounting firm of Peat, Marwick, Mitchell & Company to make a complete examination of its records and report their determination of reimbursable costs and settlement expense on the terminated contracts. The contract with this accounting firm was for the payment of their services at their regular rates for accountants engaged on the work. They were engaged for a period of approximately lO[1]/^ months from June 1953 to the middle of April 1954. The cost of this examination and report was $16,875.
Representatives of the accounting firm of Peat, Marwick, Mitchell & Company attended a conference at the cost inspector’s office in Milwaukee July 6-7, 1954, and thereafter *380 issued a supplementary report July 13, 1954. They also attended conferences in Washington, D. C. in September and October 1954. Their total charge for services rendered was $25,086.43. However, during a portion of this period this firm was also engaged upon accounting for plaintiff’s suit in the Court of Claims for breach of contract 11861, on which a report was issued by them August 20, 1954. There is no satisfactory evidence of the time this accounting firm was engaged on the breach of contract suit, and the time these accountants were engaged upon the supplementary report and conferences on reimbursable costs and termination expense. A fair and reasonable allowance for costs of preparing the supplementary report, attending conferences during July to October 1954 on reimbursable costs and termination expense, and reimbursement of traveling expense, is the sum of $1,000.
A fair and reasonable allowance for accounting services on reimbursable costs and termination expense is the sum of $19,318.24. Of this sum $426.16 is applicable to contract 11441 and $18,892.08 is applicable to contract 11861.
43. The plaintiff’s auditors reported legal expense of $16,991.05 in negotiating for the settlement of plaintiff’s contracts. The plaintiff paid its Washington counsel, Eobert S. Moss, the sum of $765.49 for fees and expense on contract 11447 during the period May to December 1952, and $6,695.53 on contract 11861 during the period from May 1952 to January 1953. The plaintiff also paid its Washington counsel $750 for services in March 1954 on account of contract 11861. There were no conferences held for settlement negotiations after the January 15, 1953 conference until July 1954, after the plaintiff’s accountants had completed their audit report. There is no satisfactory evidence that the services rendered in March 1954 were performed in connection with the settlement of the plaintiff’s Navy contracts.
The plaintiff’s audit report included payments to Harvey W. Peters of $8,761.62 for legal services in connection with the settlement of contract 11861. Mr. Peters was plaintiff’s regularly employed tax counselor, but also engaged in settlement negotiations and the preparation of cost data in the manner requested by the Navy cost inspector. He was paid *381 $3,627.62 for services and expense in connection with the settlement negotiations on contract 11861 during the. period from July to December 1952. Mr. Peters was also paid the sum of $3,409 for services and expense on contract 11861 during the period May 1 to July 31, 1953. There were no conferences or negotiations with Government officials during this period, and Peters was engaged largely with plaintiff’s auditors, Peat, Marwick, Mitchell & Company, and the preparation of cost data, but also engaged in conferences with plaintiff’s officials and its Washington counsel. A reasonable allowance for his services rendered on contract 11861 is the sum of $3,627.62.
The plaintiff’s cost of legal services and expense reasonably attributed to the settlement of its Navy contracts was $765.49 on contract 11447 and $10,323.15 on contract 11861.
44. The plaintiff’s auditors determined the salaries and wages of officials and employees for their time engaged on termination settlement work at $12,015.06, but no claim for reimbursement is made for this expense.
The plaintiff paid traveling expense of officials engaged on termination settlement work in the amount of $1,925.36. This is a reasonable cost for the travel performed in attending conferences in Washington, D. C. and is assigned in full to settlement expense for contract 11861.
45. The plaintiff paid for public clerical and calculating services during September and October 1953 in the sum of $475.32. These services were performed in connection with the audit by Peat, Marwick, Mitchell & Company, and are properly chargeable to the settlement expense of contract 11861.
46. The fixed fee of $13,000 specified in contract No. 11447 remained unchanged by the amendments to this contract.
Contract No. 11861 provided that, in the event of termination, a profit allowance of two percent on unprocessed materials and eight percent of other costs would be made, but not to exceed six percent of the total cost of work terminated. The cost of unprocessed materials, prior to reductions for disposal credits, was $226,195.52 on which the profit would be $4,523.91. Other performance costs, exclusive of the cost of special construction, total $159,796.93 on which the *382 profit would be $12,783.75. The total profit allowance on contract 11861 is $17,307.66.
Other performance costs on 11861:

47. The plaintiff’s performance costs under its contracts and fair and reasonable allowances of payments for termination settlement expenses are summarized in the following tabulation:

*383

48. Offset and reduction of claim. In October 1954 A.. A. Wagner confessed that payments of bis personal expenses through the corporation were designated by him for charges against company expense accounts. He then stepped aside as president of the firm and A. J. Werner succeeded him as president. A. J. Werner immediately employed the accounting firm of Peat, Marwick, Mitchell & Company to make an investigation of the company’s accounts to determine all such irregular charges. This work was performed under a separate contract with that firm, apart from the work performed on plaintiff’s termination claim which was reported April 15, 1954, and the supplementary report of July 13, 1954. This work was performed by a different accountant of that firm. They were engaged on this work for approximately one year. During the same period two accounting special agents of the FBI also were engaged in the investigation of plaintiff’s claim and irregular charges for approximately one year.
Because of the method employed by Wagner in changing certain invoices covering his personal expense so that they could not be readily identified, as hereinafter reported, it was not possible to determine whether all such items were detected and eliminated. Considering this possibility, the plaintiff agreed to a reduction of its claim in an amount equivalent to the proportion of factory and general overhead allocations to its Navy contracts from $15,000 of such items.
In the plaintiff’s original claim submitted to the Navy Department the factory and general overhead expenses included a substantial portion of these personal items which were subject to allocation in part to the Navy contract work. On the basis of the plaintiff’s method of allocations for both factory and general overhead costs, the sum of $5,535.53 was included in the allocations to its Navy contracts, which was equivalent to approximately seven percent of the $79,009.72 *384 personal items charged to the company accounts during the contract period from March 9,1951 to June 30,1952.
On the basis of allocations of factory and general overhead reported herein (findings 30 to 35), the Navy contracts would have borne $3,201.63 or 4.05 percent of the total personal expenses charged to the company accounts. Assuming that-there were additional items of personal expense of $15,000 not detected by the investigations, the amount for deduction from the Navy contract allocations of overhead is the sum of $607.50 (4.05 percent of $15,000). Since overhead costs represent a performance expense it carried a profit allowance of eight percent, amounting to $48.60. Thus the total deduction from the costs and profits in the preceding finding is $656.10.
ALLEGATIONS OF FRAUD
49. On April 25,1956 the defendant filed in this action an affirmative defense of fraud and counterclaims. The allegations of fraud allege the following:
(a) The termination settlement proposal submitted to the defendant July 21, 1952 on contract NOrd 11861 contained a statement that all of the material for item I on this contract had been delivered, unloaded and inventoried at plaintiff’s plant, whereas a portion of the materials purchased had been shipped by the supplier to other consignees, and that the plaintiff’s allocation of indirect factory expense was based upon 23.6 percentage of completion which the plaintiff had estimated for materials acquired for the performance of the contract.
(5) The plaintiff submitted to the Bureau of Ordnance on or about April 27,1954 a report of its audit and determination of costs attributable to contracts NOrd 11447 and NOrd 11861, purportedly prepared from its books and records. The said report was also submitted on June 29,1954 pursuant to an order of the trial commissioner under Court of Claims Buie 28 (b) (2), with the statement that plaintiff would rely upon the figures therein contained.
The said report contained an item of $20,488.32 for settlement with subcontractors, which included an amount of $18,190.55 on account of the Kropp Forge Company, whereas *385 this account was settled for $2,697.44 and tbe difference of $15,493.11 was not passed on to the defendant.
(c) The said report also contained costs in the performance of both Navy contracts of $283,526.79 for indirect manufacturing expense and $145,247.62 for general and administrative expense. The said sum of indirect expense was alleged to be false in that plaintiff’s books included personal charges of $70,020.58 during the contract performance period, of which sum $4,831.81 was allocated to contracts NOrd 11447 and NOrd 11861.
50. Allegation (a). The plaintiff submitted its original termination settlement proposal on contract 11861 for both item I and item II on July 21, 1952. It claimed allocable overhead expense upon the basis of the percentage of completion of the contract and upon the amounts of overhead in its original estimate. On schedule A of item I a tabulation of its original estimate shows material costs of 23.6 percent of its estimate total unit cost of production. This schedule is followed by the statement:
All of the material for item 1 on contract NOrd 11861 was delivered, unloaded, and inventoried at our plant and we were completely ready for production when we received notice of cancellation. The project on the date of cancellation was therefore 23.6% complete.
Although the plaintiff had acquired substantially all of the material required for its production contract, the steel billets were substantially all shipped direct to its subcontractor, the Kropp Forge Company of Chicago, and some materials were shipped to other subcontractors, the locations of which were all shown on the termination inventory schedules previously submitted on Department of Defense forms. At termination of contract 11861 there remained at subcontractors some 517,138 pounds of billets and other materials under item I of this contract. Most of the materials under item II of this contract, including billets, other steel and supplies weighing 562,920 pounds had been previously shipped to S. A. Hicks & Company in Boston upon orders of defendant’s officials. The plaintiff’s inventories show the location of all materials on hand as well as materials previously shipped.
*386 Although the statement on schedule A of item I claim under contract 11861 is in conflict with the facts as to the location of materials shown in other termination data submitted, there is no evidence that it was submitted in an attempt to defraud the United States.
The acquisition of material as a percentage of the total estimated cost of performance would not be a proper measure for allowances of plaintiff’s estimated overhead expenses, and the cost inspector rejected the proposed settlement on this basis as reported in finding 24.
51. Allegation (b). In its termination settlement proposal submitted July 21, 1952, for item I of contract 11861, the plaintiff attached schedule F tabulation of settlements with subcontractors which contained an item of $18,190.55 in settlement with its subcontractor Kropp Forge Company through Wagner Engineering Company for die blocks. This item was included in the total of such settlements amounting to $20,488.32.
The plaintiff’s auditor on termination costs, William A. Froehlich of Peat, Marwick, Mitchell & Company, understood that there was no controversy on settlements with subcontractors and made no further examination into these items, but reported the same amount as originally claimed in his audit report of April 15,1954.
The item of $20,488.32 had been included and paid on the third partial payment voucher of the termination settlement claim under contract 11861 (finding 24). However, in submitting this voucher to the Bureau of Ordnance on October 9,1952, the Inspector of Naval Materials reported his Understanding that the actual cost of the settlement with subcontractors would be the amount ultimately paid. The plaintiff had been so advised of this conditional allowance in a conference on its settlement proposal September 29-30, 1952.
The Wagner Engineering Company was also owned jointly by Wagner and Werner, and the subcontract work with Kropp Forge Company was acquired, by plaintiff through it at no additional cost and with the consent of the Inspector of Naval Materials. Thereafter, the Kropp Forge Company agreed to retain the die blocks manufactured for the production of forgings under contract 11861, and its claim *387 was settled for $2,028.08. This sum was tbe amount ultimately agreed upon and included in the sum of $2,297.77 reported in finding 39 herein.
There is no evidence of fraüd or attempted fraud on the part of any of plaintiff’s officials in the submission of this item of its termination settlement proposal.
52. In October 1953, the plaintiff received a check dated October 6, 1953 from the Aetna Casualty and Surety Company in the amount of $15,709 representing an adjustment and partial refund of premium for workmen’s compensation and liability coverage for prior periods. The refund adjustment became payable only after the insurer had audited the payrolls covered by the policies. The policies provided insurance for the plaintiff, Wagner Iron Works, Wagner Engineering- Works, York-Wagner Corporation, The Wagner Shipbuilding Corporation and Wagner-Werner Company. All of the participating insured were endorsers on the check and it was negotiated by Wagner-Werner Company at the First National Bank of Chicago. There is no evidence of how this refund was credited among the several insured companies, or how it was treated on the plaintiff’s books. The plaintiff’s audit report of April 15,1954, which was submitted June 29, 1954 under Rule 28 (b) (2) of this court failed to report any part of this refund in the overhead apportionments of costs on the Navy contracts herein.
During the trial of this case the plaintiff submitted revised schedules of its settlement claims wherein the proportionate credits for the period of the contracts herein were deleted from the overhead accounts that were subject to allocation to the Navy contract work. The amount credited to the factory insurance account was $8,697.66 and the amount credited to the insurance account for office workers was $20.80. By reason of these credits the overhead expense allocated to Navy contracts was reduced by approximately $1,050.78.
53. There is insufficient evidence to determine that the plaintiff’s officials intentionally withheld the insurance adjustment credit from accounts which were allocable in part to the Navy contracts. Neither can the plaintiff’s accoünt-ants be discredited for failure to discover this credit which *388 would have been recorded in the books some 1% years after June 30, 1952, which, was the ending date of the contract period audited.
54. Allegation (o). Early in October 1954, A. A. Wagner presented a list of personal invoices to Werner and confessed that they had been charged to the company’s accounts. He agreed to compile lists of all personal items and to make restitution to the corporation. It was later discovered, as a result of the investigations reported in findings 31, 32 and 48, that much of Wagner’s personal expenses had been paid by and charged to the company’s accounts since 1944, when Werner first became associated with the Wagner Iron Works.
At a meeting of the Board of Directors on November 22, 1954, Wagner resigned as president of the company, and Werner was elected president and authorized to inform the Internal Revenue Service of the irregularities discovered in the company’s accounts and to pay the additional taxes that might be necessary for all prior years. Werner immediately contacted the Chicago office of the Internal Revenue Service, and the Milwaukee office of the FBI,[1] informing both of these services of the irregularities discovered in the company’s accounts, and employed the accounting firm of Peat, Mar-wick, Mitchell & Company to make an investigation for the determination of all personal charges to the company. The investigation by Peat, Marwick, Mitchell & Company of irregularities was performed under the direction of accountant Frank Birch, and covered a period of six or seven months.
On August 5, 1955, plaintiff brought suit against Wagner and the Hampshire Investment Company, a corporation controlled by Wagner, in the Circuit Court of Milwaukee County, for the recovery of sums diverted by Wagner and his corporation between 1944 and 1954 and for damages to plaintiff in the aggregate amount of $308,810.08. Prior to the hearing in this proceeding Wagner was indicted on several counts of income tax evasion, and he entered a plea of guilty on two counts. Wagner did not appear as a witness in this proceeding.
*389 55. On October 1, 1954, A. A. Wagner, as President of Wagner Iron Works wrote Black-Top Specialty Company of Hartland, Wisconsin:
I am enclosing photostatic copies of bills and vouchers from your company inasmuch as the Internal Bevenue men have looked at them, and I would like you to have a copy for your records which I am sure are in agreement with ours. If there are any questions, kindly phone me.
Attached to this letter were purchase orders by Wagner Iron Works totaling $3,017.53, and Black-Top Specialty Company statements, as follows:

The foregoing statements were not, in fact, for any work performed for the Wagner Iron Works. They were not even billed by Black-Top Specialty Company to Wagner Iron Works. The Black-Top Specialty Company had constructed a tennis court for A. A. Wagner at his Pine Lake property, and furnished limestone and top soil, and constructed a black top driveway into his property, all on a “time and material basis”. While Black-Top Specialty Company was performing the above work for Wagner personally, Wagner requested that company to furnish him with some of its statement forms or invoices in blank so that he could charge it off the way he wanted on his (company) books. Such blank invoice forms were furnished to Wagner pursuant to such request. He had fictitious invoices prepared showing that the work was accomplished by Black-Top for the plaintiff company.
The above items were paid by Wagner Iron Works and charged to its indirect account No. 559 — Maintenance and repairs — yard, a portion of which was allocated to its Navy contracts.
*390 The above items were later adjusted and deleted in its revised schedules, together with other similar items in this account in the aggregate of $6,266.13.
56. On March 27, 1951, George L. Weiand, funeral director, submitted an invoice of $1,015 to Wagner Iron Works for the funeral of Guido Schmidt, A. A. Wagner’s father-in-law. A $25 discount was allowed for prompt payment. On the same date Weiand submitted a bill to Mrs. Guido Schmidt of $70 for cemetery expense. Wagner Iron Works paid both bills by check dated April 17,1951 in the net sum of $1,060. This item was charged to plaintiff’s account No. 535 — miscellaneous shop expenses, which was allocated in part to the Navy contracts.
The plaintiff sought and received restitution of this amount from A. A. Wagner. This item was thereafter deleted in plaintiff’s revised schedules of indirect factory expense, and included in the total adjustment for personal items of $1,476.79 to account No. 535.
57. Vogt, Inc. performed personal work for A. A. Wagner consisting generally of basement work, stone filling, rods and mesh, dozing, carting, labor and chips supplied for a driveway. Two invoices, dated June 1 and 4, 1951, were made out to A. A. Wagner in care of Wagner Iron Works amounting to $1,578.95. These invoices were paid by Wagner Iron Works on June 22,1951, and the charge of $1,578.95 was made to the company’s material account No. 221. No part of this account was charged to the Navy contracts, nor was any apportioned to them.
An invoice to Wagner dated September 19, 1951 for $998.00 was paid by the plaintiff company on September 25, 1951 and charged to the company’s account No. 559 for maintenance and repairs to yard and was allocated in part to its Navy contracts. This item was deleted in the plaintiff’s revised schedules of factory expense, together with other personal items for the total amount of $6,266.13.
The bookkeeper for Vogt, Inc. had furnished blank statement forms of that company upon a telephone request from someone at Wagner Iron Works so that statements could be revised and made out to the company instead of A. A. Wagner for the payment voucher. One such personal invoice *391 was made out under date of June 25, 1952, and paid by the company July 8, 1952. Wagner had acknowledged this as one of his personal expenses in one. of the lists submitted, although the payment and charge were beyond the contract period, and not involved directly herein.
58. The Paul J. Grunaú Company performed some plumbing work at the home of A. J. Werner’s mother at 3736 W. Dorothy Place, Milwaukee, Wisconsin, and submitted a cost sheet to A. J. Werner, dated January 14, 1952, for $508.64. A statement of this account was sent to Wagner Iron Works, attention Arnold Werner which was received January 24, 1952. It was marked “ok to pay A J W”, and the company’s check dated February 15,1952, was issued in payment thereof in the amount of $508.64. This item was charged to the company’s indirect factory expense account No. 551 for maintenance and repairs of buildings which was allocated in part to the Navy contracts.
Werner was billed for this plumbing work by the company on October 26, 1954, and his personal' check was issued to Wagner Iron Works December 21, 1954 for the sum of $508.64 in repayment. This item was thereafter deleted from plaintiff’s indirect factory expense in its revised schedules, together with other personal items of A. A. Wagner in the aggregate sum of $3,858.66.
59. Swimming pools. Factory order 6446-1 was initiated May 2,1950 for the construction of a swimming pool for one Weiner, Vice President of Pabst Brewing Company, who had negotiated an order with plaintiff for some $300,000 worth of taping machines. Some time later factory order 6933-1 was initiated for the construction of a swimming pool for A. J. Werner. During the performance of such orders the costs for labor, materials and subcontract work is normally charged to work in process under such shop orders. After Werner’s shop order accumulated charges of approximately $3,300 it was transferred and combined with Weiner’s shop order 6446-1. Upon the completion of the work about December 1951, factory and administrative burden was added to the direct costs for a total cost of $18,834.76. A. A. Wagner endorsed upon the order under date of December 18, 1951 “Charge to Sales promotion expense and entertaining cus *392 tomers”. But on May 15, 1952 an order to the accounting department directed that Weiner be charged $12,800 and that the personal account of A. J. Werner be charged $6,034.76 in accordance with an office memorandum by A. J. Werner.
In September 1952 the cost of the swimming pools was again discussed by Wagner and Werner and it was decided that because of the business Weiner brought to Wagner Iron Works he should not be charged for the cost of his pool, and since Werner’s pool was used largely for entertaining customers, and he was paying the maintenance costs, the entire construction costs should be charged to sales expense. The evidence is not clear whether it was charged to sales expense at that time. But on October 6,1954 Werner issued a memorandum that because of the manner Wagner had handled his personal affairs, he could not permit his portion of the cost of the pools to remain as it was at that time, but that it be charged to his personal account in accordance with his original letter of May 15, 1952. Thereafter on December 23, 1954, Werner issued his personal check to Wagner Iron Works for $6,034.76, which was paid December 27, 1954.
An invoice by The Paul Grunau Company for $1,280.27 was billed to Werner at the Wagner Iron Works, dated July 31,1951, for the heating mechanism for Werner’s swimming pool and was paid by the company September 12,1951. The entry on the invoice indicates the charge of $1,280.27 was made to the indirect manufacturing expense account No. 521-4, “heating plant repairs”, and approved for payment by AJW, under work order 6933-1. This item was thereafter deleted in plaintiff’s revised schedules of factory expense, which were allocated in part to the Navy contracts.
The plaintiff’s accountant concluded that this was a duplicate charge, since all charges on factory Work orders are charged to “work in process” and endorsed on the.back of such work order, and upon completion of the job, the work in process is credited and the appropriate account charged for the full cost. In the event that a duplicate charge did occur in this instance, the work in process account would have carried an excess credit in like amount until year end when inventories were prepared and reconcilements were made.
*393 60. Wagner bad made arrangements with the Viking Oil Company for deliveries of fuel oil to the home of company officials. Viking Oil Company also made deliveries to the company of fuel oil and gasoline under contract. Many of the invoices for deliveries of oil to Wagner and Werner were paid by the company and charged to its fuel account. Upon the discovery and compilation of these personal invoices, Werner made payment to the company of $3,490.28 about March 15, 1955. In submitting a memorandum of these personal invoices to the accounting department, Werner wrote “you will note from these records that I was improperly advised by Mr. Wagner as to the amount of oil delivered in my behalf”.
During the contract period personal invoices for oil deliveries to Wagner and Werner were paid by the company and charged to its account No. 521-1 for fuel, in the sum of $3,200.24. This account was one of the indirect factory expense accounts and was allocated in part to the Navy contracts. These charges included personal deliveries of oil for A. A. Wagner in the amount of $1,758.94, and personal deliveries for A. J. Werner of $1,441.30.
In plaintiff’s revised schedules $2,673.54 was deleted from the plaintiff’s fuel account, and the $526.70 was adjusted during the trial of this case as reported in finding 32.
61. The plaintiff’s bookkeeper was responsible for the proper account classification for expenditures of the company, and he did mark vouchers for purchases and other costs. But many of the vouchers were also marked by Wagner and Werner, and in all cases where a responsible official made such designation, the bookkeeper accepted such account designations without further examination of the item.
William A. Froehlich, the accountant in charge of the Peat, Marwick, Mitchell & Company audit for the determination of costs under the Navy contracts, did not question the propriety of charges, and had not been apprised of possible irregularities in the company’s accounts and none was discovered by him. Thus, the audit report issued by these accountants contained all of the personal items of Wagner and Werner that were classified and charged in accounts allocated in part to Navy contract work.
*394 After the investigation, of these irregularities by another accountant of the same firm had been completed, Froehlich made the adjustments by deleting all of these items from accounts affecting the Navy contract costs. They are shown as “Non-corporate charges” in plaintiff’s revised schedules.
62. Considering the foregoing findings (54r-61 inclusive) wherein it is found that the personal expenses of both Wagner and Werner were paid and charged to plaintiff’s accounts, the methods employed by Wagner in preparing fictitious vouchers for the purpose and intent of concealing such charges from detection in any normal audit procedure, and with the knowledge that portions of such payment would be charged to the performance costs of the plaintiff’s Navy contracts in the usual accounting practice of apportioning indirect expense accounts, it is found that the plaintiff company is guilty of fraud against the United States.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff corruptly attempted to practice, and did practice, fraud against the United States in the proof or establishment of its claim. Accordingly, pursuant to section 2514 of Title 28 of the United States Code, plaintiff’s claim is forfeited to the United States, and its petition is dismissed.
It is further concluded that the defendant is entitled to recover on its counterclaims, and it is, therefore, adjudged and ordered that the United States recover of and from the Wagner Iron Works the sum of two thousand dollars ($2,000).

 Section 2514 reads :
"A claim against the united States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
“In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture.”

 RBI accountants were then engaged pursuant to Rule 28 (b) (3), In an audit of plaintiff’s accounting statement which was furnished to defendant pursuant to Rule 28 (b) (2).